## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Samantha Simonetta | ) | |
| | ) | Civil Action |
| **Plaintiff,** | ) | No.          20-32 |
| | ) | |
| v. | ) | |
| | ) | |
| Allegheny College, Bill Ross, William "BJ" | ) | **JURY TRIAL DEMANDED** |
| Hammer II, Curtis Bailey, Andrew Fragale, and | ) | |
| Nikki Newman | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |
| | ) | |

## Complaint

And now comes Plaintiff, Samantha Simonetta, by and through her undersigned counsel,

Kristen C. Weidus, Esq., and Ruder Law, LLC, and files the following Complaint against

Defendants Allegheny College, Bill Ross, William "BJ" Hammer II, Curtis Bailey, Andrew

Fragale, and Nikki Newman.

## Preliminary Statement

Plaintiff Samantha Simonetta files this Complaint against Defendant Allegheny College to

seek money damages based upon Defendant's willful violations of Title IX of the Education

Amendments Act of 1972, 20 U.S.C. §§ 1681-1688, the regulations and policies promulgated

thereunder, 34 C.F.R. § 106, and the gender-based abuse, harassment, and discrimination, and

physical, verbal, mental, and emotional abuse and harassment Ms. Simonetta suffered as a result

of Defendants' tortious conduct.

**Parties**

1.      Plaintiff, Samantha Simonetta ("Ms. Simonetta") is an adult individual who is a resident of the Commonwealth of Pennsylvania and was, at all times relevant to this Complaint, living in Meadville, Pennsylvania and attended Defendant Allegheny College ("the College").

2.      Defendant, Allegheny College, ("the College") is a private liberal arts college located in Meadville, Pennsylvania. The College received and continues to receive federal financial assistance, which it uses to support its academic and athletic programs.

3.       Defendant Bill Ross ("Ross") is an adult individual and the Director of Athletics and Recreation at the College, and, at all times relevant to this Complaint, maintained his domicile and residence in the Commonwealth of Pennsylvania.

4.      Defendant, William "BJ" Hammer II ("Hammer II") is an adult individual and the former Head Football Coach at the College, and, at all times relevant to this Complaint, maintained his domicile and residence in the Commonwealth of Pennsylvania.

5.      Defendant, Curtis Bailey ("Bailey") is an adult individual and an Assistant Football Coach at the College, and at all times relevant to this Complaint maintained his domicile and residence in the Commonwealth of Pennsylvania.

6.      Defendant, Andrew Fragale ("Fragale") is an adult individual and an Assistant Football Coach at the College, and at all times relevant to this Complaint maintained his domicile and residence in the Commonwealth of Pennsylvania.

7.      Defendant, Nikki Newman ("Newman") is an adult individual and served as a Third Party Witness to the incidents alleged in the Complaint, and at all times relevant to this Complaint maintained domicile and residence in the Commonwealth of Pennsylvania.

**Jurisdiction and Venue**

8.      This Complaint seeks appropriate relief for violations of Title IX of the Education Amendments Act of 1972 , 20 U.S.C. §1681(a).

9.      This action arises under the laws of the United States, and therefore this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331.

10.      This Honorable Court has subject matter jurisdiction over Ms. Simonetta's state law tort claims pursuant to 28 U.S.C. § 1367(a) because the state law tort claims are so related to Ms. Simonetta's claims under Title IX of the Education Amendments Act of 1972 that they form part of the same case or controversy under Article III of the United States Constitution.

11.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391, because the events and omissions giving rise to the claims in this case arose in this judicial district and all parties reside in this judicial district.

**Factual Allegations**

Harassment By Football Teammates

12.      On October 5, 2017, Ms. Simonetta reached out to Defendant Hammer II to express an interest in joining the College's football team.

13.      In the upcoming days, Ms. Simonetta met with Defendant Hammer II to discuss in more detail, began informal practice, and met with several football players.

14.      In November 2017, Ms. Simonetta contacted Defendant Hammer II, indicating that she was still interested in playing football. She also shared that as a result of a medical condition, she was temporarily required to take steroid medication. Defendant Hammer II never responded to her correspondence.

15.     That same month, Ms. Simonetta returned paperwork confirming her intent to participate on the football team the following season. Despite this, the coaching staff chose not to include her in the team's winter workouts.

16.     On January 15, 2018, Defendant Bailey finally acknowledged Ms. Simonetta's previous correspondence.

17.     On January 16, 2018, Ms. Simonetta met with Defendant Bailey and discussed her mandatory steroid medication use in more detail.

18.     On January 24, 2018, Ms. Simonetta received an email from Defendant Bailey requesting that she sign the required NCAA handbook. Ms. Simonetta did so; however, Defendant Bailey elected not to respond, or to acknowledge receipt.

19.     By the end of January 2018, Ms. Simonetta began participating in the football team's winter workouts.

20.     On February 5, 2018, one of Ms. Simonetta's teammates began openly making unwelcome sexual advances towards her during football practice. This included but was not limited to inappropriately leering at her buttocks. He also made explicit and inappropriate sexual comments to her, including telling her he would "fuck her silly." This was witnessed by several other teammates.

21.     On February 8, 2018, Ms. Simonetta's teammate continued his harassment, now escalating to unwanted physical touching by putting his arm around her and telling her that she was beautiful.

22.     Later that day, this same teammate confronted Ms. Simonetta outside of the team's weight room. Despite Ms. Simonetta's efforts to decline his advances, he continued his harassment.

23.      By mid-February 2018, Ms. Simonetta determined it was necessary to disclose her teammate's inappropriate conduct to Defendant Bailey. As a victim of prior sexual assault, Ms. Simonetta was particularly vulnerable and uncomfortable being forced to take this step.

24.      Defendant Bailey assured her the teammate's conduct would be addressed with Defendant Hammer II. He also reiterated that all players were required to treat each other with respect.

25.      Ms. Simonetta trusted that Defendant Bailey would take the steps required.

### Retaliation Following Report of Sexual Harassment

26.      Spring football practices resumed in March 2018. At that time, Ms. Simonetta was provided with a practice jersey but was not given access to a locker room. Furthermore, she was not assigned a jersey number like her male teammates.

27.      On or about April 11, 2018, Ms. Simonetta notified the coaching staff via email to let them know she would be forced to miss practice due to a required academic project. The coaching staff chose not to respond.

28.      Upon information and belief, other teammates missed practice for similar reasons throughout the season.

29.      On April 13, 2018, Ms. Simonetta again met with Defendant Bailey. At that time, he placed Ms. Simonetta on academic probation, stating that all team members were required to maintain a particular grade point average.

30.      Upon information and belief, at the time of her placement on academic probation, Ms. Simonetta's grade point average was sufficient for her to remain eligible to participate. In other words, academic probation was inappropriate based on the College's own policies and standards at the time Defendant Bailey implemented this punishment.

31.     As a result of her placement on academic probation, Defendant Bailey explained, Ms. Simonetta would not be permitted to participate in practice sessions. It was thus Ms. Simonetta's understanding following this April 13, 2018 discussion that she was not required to attend future practices.

32.     Upon information and belief, other football players were not subject to this same treatment.

33.     On April 24, 2018, Ms. Simonetta was again contacted by Defendant Bailey's office. At this time, she was informed that she was being suspended from the team as a result of her academic performance and missed practices.

34.     Defendant Bailey also informed Ms. Simonetta that three male players had been recruited.

35.     Ms. Simonetta reached out to her mother following receipt of this correspondence, who encouraged Ms. Simonetta to speak to Defendant Bailey in person.

36.     Ms. Simonetta ultimately approached Defendant Bailey during that day's football practice. Although unwilling to speak privately with her at that time, Defendant Bailey instructed Ms. Simonetta to follow-up with him after she received her grades.

37.     On May 1, 2018, Ms. Simonetta emailed Defendant Bailey, at which time she informed him that her grades had improved. Defendant Bailey elected not to respond to this email correspondence.

38.     On May 22, 2018, Ms. Simonetta sent proof of her improved grades to Defendant Bailey. She again received no response.

39.     On July 25, 2018, Ms. Simonetta again emailed Defendant Bailey, requesting a response to her earlier correspondence. She explained that the season was quickly approaching, and that she was ready to return to the team.

40.     On July 30, 2018, Defendant Bailey finally responded to Ms. Simonetta's inquiries. Rather than acknowledging her improved grades, he now demanded that she wait until the conclusion of the fall semester to return to the team.

41.     Further, Defendant Bailey suggested that, in the interim, she serve as a team manager rather than football player.

42.     Ms. Simonetta received no further offseason correspondence from the football coaching staff until August 3, 2018. At that time, she was told to report to campus only six days later on -- August 9, 2018.

43.     Despite this lack of notice, Ms. Simonetta did report to campus on August 9, 2018. She received her dormitory key, but no information regarding the football schedule was provided.

44.     On August 9, 2018, Defendant Bailey sent a text message to Ms. Simonetta, asking where she was. Ms. Simonetta was confused, as she had not been provided any information suggesting she had a team commitment that day.

45.     As a result of this ongoing lack of appropriate communication and deliberate exclusion from team activities, Ms. Simonetta's parents requested a meeting with the Athletic Director and members of the football coaching staff.

46.     The requested meeting took place on August 10, 2018 at 3:00 PM. In addition to Ms. Simonetta and her parents, Defendant Ross, Defendant Hammer II, Defendant Bailey, Defendant Fragale, and Defendant Newman were in attendance.

47.     Ms. Simonetta tried to explain her position regarding the coaching staff's deliberate withholding of team information, but she was promptly interrupted and accused of lying.

48.     Ms. Simonetta was anxious and uncomfortable throughout the meeting as a result of the coaching staff's overall aggressive and dismissive demeanor.

49.     As a result of her obvious discomfort, Mr. Simonetta determined it was necessary for him to interject. More specifically, he asked those present if it was an appropriate time to discuss the previously reported sexual assault Ms. Simonetta was subjected to by her football teammates.

50.     The room went silent.

51.     Defendant Bailey ultimately admitted that he was aware of the team's sexual misconduct, but that he had failed to report it despite being mandated to do so.

52.     Although Defendant Bailey had previously represented to Ms. Simonetta that he presented the information to Defendant Hammer, it was ultimately revealed during this meeting that this was a lie.

53.     Defendant Ross promptly stopped the meeting following these disclosures, and indicated that "appropriate authorities will need to be involved."

54.     Following this meeting, Ms. Simonetta had no formal contact with the football team or coaching staff. However, when she attempted to use the College's weight room, she was leered at and intimidated by members of the football coaching staff.

55.     It became clear to Ms. Simonetta that the football coaching staff had deliberately elected not to proceed with an investigation, opting instead to "resolve" the issue by forcing her off the football team.

### Continued Harassment Post-Removal from Football Team

56.     Although no longer a member of the football team, Ms. Simonetta continued to be sexually harassed by her former teammates.

57.     On one occasion in September 2018, another teammate inappropriately touched Ms. Simonetta, going so far as trying to kiss her without her consent.

58.     Ultimately, this teammate attempted to pull Ms. Simonetta into his dormitory room, but he was unsuccessful.

59.     Knowing that the football coaching staff was more interested in protecting its players than appropriately addressing sexual misconduct, Ms. Simonetta elected to instead report these incidents to the College's Title IX coordinator.

60.     Upon information and belief, Ms. Simonetta later learned that other members of the College's faculty were aware of previous incidents of sexual misconduct by the perpetrating teammate.

61.     Ms. Simonetta formally pursued action through the College against this student, ultimately resulting in a finding on December 17, 2018 that her former teammate had violated the College's Policy Against Discriminatory and Sexual Harassment, Including: Sexual Assault and Other Forms of Sexual Violence, Dating Violence, Domestic Violence and Stalking.

62.     This finding makes clear that, had the football coaching staff appropriately reported the prior incidents, the College could have investigated and prevented further sexual assault by football players from occurring.

### Count I: Violation of Title IX, 20 U.S.C. § 1681
### Samantha Simonetta v. Allegheny College

63.     Ms. Simonetta hereby incorporates the averments set forth in each of the proceeding paragraphs by reference as though fully set forth at length.

9

64.     Title IX of the Education Amendments Act of 1972 prohibits gender-based discrimination in education programs, including the most severe expression of sex discrimination—sexual violence.

65.     Defendants' gender-based abuse, harassment, and discrimination constitute violations of Title IX of the Education Amendments Act of 1972.

66.     The College received and continues to receive federal financial assistance, which it uses to support its academic and athletic programs.

67.     Ms. Simonetta was subjected to gender-based abuse, harassment, and discrimination.

68.     The gender-based abuse, harassment, and discrimination occurred under circumstances where the College exercised substantial control over both the harassers and the context in which the abuse, harassment, and discrimination occurred.

69.     The College had actual knowledge of the gender-based abuse, harassment, and discrimination.

70.     The College engaged in a pattern and practice of behavior designed to discourage and dissuade students who had been harassed and physically, mentally, and/or sexually abused from seeking prosecution and protection, as evidenced by the actions taken by the football coaching staff and players following Ms. Simonetta's disclosure to Defendant Bailey.

71.     Despite actual notice of the harassment, the College was deliberately indifferent to the gender-based abuse, harassment, and discrimination.

72.     At all relevant times, the College had a duty to provide Ms. Simonetta

with a safe and hostile-free environment where she could access appropriate educational benefits

and opportunities.

73.     The College persisted in its actions and inactions even after having actual

knowledge of the harm suffered by Ms. Simonetta.

74.     The gender-based abuse, harassment, and discrimination was so severe,

pervasive, and objectively offensive that it deprived Ms. Simonetta of access to the educational

and extracurricular opportunities and benefits provided by the College.

75.     The gender-based harassment created an objectively hostile and/or abusive

educational environment for Ms. Simonetta.

76.     Ms. Simonetta has suffered and continues to suffer damages by reason of

Defendants' violations of Title IX of the Education Amendments Act of 1972.

WHEREFORE, Ms. Simonetta demands judgment for compensatory and punitive

damages against the College together with court costs, attorneys' fees, interest, and all other

relief permitted by this Honorable Court.

### Count II: Negligence
**Samantha Simonetta vs. The College, Bill Ross, William "BJ" Hammer II, Curtis Bailey, Andrew Fragale, & Nikki Newman**

77.     Ms. Simonetta hereby incorporates the averments set forth in each of the

proceeding paragraphs by reference as though fully set forth at length.

78.     Defendants, in their individual capacities, had a duty to act with ordinary

care towards Ms. Simonetta.

79.     Defendants, in their individual capacities, breached their duty of care to

Ms. Simonetta by subjecting her to gender-based abuse, harassment, and discrimination.

80.     Defendants, in their individual capacities, proximately caused damages to Ms. Simonetta.

81.     In mid-February 2018, Ms. Simonetta disclosed to Defendant Bailey that she had been the victim of sexual abuse and harassment by her teammates on the football team.

82.     Defendant Bailey assured Ms. Simonetta that he would take the appropriate steps, yet she later learned that this was a lie. Rather, Defendant Bailey deliberately withheld the information from the appropriate authorities, and thus no Title IX investigation was completed in February 2018.

83.     Further, despite attending a meeting in August 2018 wherein Ms. Simonetta again disclosed that she had been the victim of sexual harassment and abuse by her teammates on the football team, none of the Defendants took the appropriate steps to investigate the allegations as required by Title IX.

84.     Ms. Simonetta has suffered and continues to suffer damages by reason of Defendants' conduct, including but not limited to the gender-based abuse, harassment, and discrimination to which she was subjected.

WHEREFORE, Ms. Simonetta demands judgment for compensatory and punitive damages against all Defendants, together with court costs, attorneys' fees, interest, and all other relief permitted by this Honorable Court.

### Count III: Tortious Interference with Contractual Relations
### Samantha Simonetta vs. Bill Ross, William "BJ" Hammer II, Curtis Bailey, Andrew Fragale, & Nikki Newman

85.     Ms. Simonetta hereby incorporates the averments set forth in each of the proceeding paragraphs by reference as though fully set forth at length.

86.     By signing the NCAA handbook, Ms. Simonetta entered into a valid, legal, binding contract with the College's football program.

87.     Defendants in their individual capacities interfered with Ms. Simonetta's ability to participate in the football program pursuant to the NCAA handbook by subjecting her to gender-based abuse, harassment, and discrimination.

88.     More specifically, Defendants did so by failing to initiate an appropriate Title IX investigation following Ms. Simonetta's disclosures in February 2018 and again in August 2018.

89.     Defendants in their individual capacities did not have any privilege to interfere with Ms. Simonetta's participation in the football program pursuant to the NCAA handbook.

90.     Ms. Simonetta has suffered and continues to suffer damages by reason of Defendants' tortious interference with the NCAA handbook, including but not limited to the loss of the benefits of participation in the College's football program.

WHEREFORE, Ms. Simonetta demands judgment for compensatory and punitive damages against Defendants Ross, Hammer II, Bailey, Fragale, and Newman, together with court costs, attorneys' fees, interest, and all other relief permitted by this Honorable Court.

### Count IV: Negligent Infliction of Emotional Distress
### Samantha Simonetta vs. Bill Ross, William "BJ" Hammer II, Curtis Bailey, Andrew Fragale, & Nikki Newman

91.     Ms. Simonetta hereby incorporates the averments set forth in each of the proceeding paragraphs by reference as though fully set forth at length.

92.     Defendants Ross, Hammer II, Bailey, Fragale, and Newman knew or reasonably should have known that the conduct described herein would and did proximately result in physical and emotional distress to Ms. Simonetta.

93.     At all relevant times, Defendants Ross, Hammer II, Bailey, Fragale, and Newman had the power, ability, authority, and duty to intervene to prevent or prohibit said conduct.

94.     Despite said knowledge, power, ability, authority, and duty, Defendants Ross, Hammer II, Bailey, Fragale, and Newman failed to act so as to prevent such conduct or otherwise protect Ms. Simonetta.

95.     To the extent that only certain Defendants perpetuated negligent conduct, the remaining Defendants confirmed and ratified said conduct with the knowledge that Ms. Simonetta's emotional and physical distress would thereby increase, and with a wanton and reckless disregard for the adverse consequences to her.

96.     As a direct and proximate result of Defendants' unlawful conduct, Ms. Simonetta has suffered and continues to suffer serious emotional distress, humiliation, anguish, and emotional injuries.

WHEREFORE, Ms. Simonetta demands judgment for compensatory and punitive damages against Defendants Ross, Hammer II, Bailey, Fragale, and Newman, together with court costs, attorneys' fees, interest, and all other relief permitted by this Honorable Court.

## REQUEST FOR RELIEF

Wherefore, Plaintiff respectfully requests this Court enter an Order:

1.  Assuming jurisdiction of this case;

14

2.  Declaring that the College's actions constituted a violation of Title IX of the Education
    Amendments Act of 1972;

3.  Awarding compensatory damages for the College's violations of Title IX;

4.  Awarding monetary damages to Plaintiff to address the emotional, mental, and physical
    anguish and distress experienced as a result of the Defendants violations of Title IX and
    state law;

5.  Awarding attorneys' fees, interest, and costs under Title IX and state law;

6.  An injunction requiring the College to enforce and apply Title IX in response to reports
    of severe and pervasive gender-based harassment, discrimination, violence, and/or
    assault; and

7.  Granting any other appropriate and necessary relief as the Court deems appropriate,
    including monetary damage, punitive and exemplary damages, and attorneys' fees.


Respectfully Submitted,

/s/ Kristen C. Weidus

Kristen C. Weidus, Esq.
Attorney I.D. No. 313486
Ruder Law, LLC
429 Forbes Avenue, Suite 450
Pittsburgh, PA 15219
Telephone: (412) 281-4959
Fax: (412) 291-1389
Email: kristenweidus@ruderlaw.com
*Counsel for Plaintiff*

Date: February 5, 2020

15